**Opinion filed October 15, 2009**



**In The**

# Eleventh Court of Appeals

_____

**No. 11-08-00058-CR**

_____

**DERRICK WALTON, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

**On Appeal from the 142nd District Court**

**Midland County, Texas**

**Trial Court Cause No. CR32304**

**M E M O R A N D U M   O P I N I O N**

A jury convicted Derrick Walton of murder. The trial court assessed punishment at forty-five years in the Institutional Division of the Texas Department of Criminal Justice. In appellant's first four issues, he argues that the evidence was legally and factually insufficient to support his conviction. In appellant's fifth issue, he argues that the trial court erred in allowing evidence of hearsay statements by appellant to one of the State's witnesses. In appellant's sixth issue, he argues

that the trial court committed reversible error by allowing evidence of an extraneous offense committed by appellant. We affirm.

*Background Facts*

Kenya Ray Harris was with a group from Odessa when he was shot in front of Price's Bar in Midland during a confrontation between the Odessa group and a group from Midland. The Odessa group consisted of Kenya, Jamie McCoy, Nevatiny Berry, and Jermane Williams. The Midland group consisted of Jason Spraglin, Mark Wilson, Antwon Wilson, Kelvin Lewis, and appellant. Kenya's death occurred after dark on July 15, 2004.

The State's first witness was Dr. Sheila Spotswood, a medical examiner in Dallas County. Dr. Spotswood was a specialist in forensic pathology and did the autopsy of Kenya. Dr. Spotswood testified that Kenya had two gunshot entrance wounds, one on his head and one on his back. The shot to the head entered the left, back part of the scalp and went through the skull, causing multiple skull fractures. Both bullet wounds were potentially fatal and were made by distant-range gunshots of more than three feet. Dr. Spotswood collected the bullet fragments; however, police officers subsequently testified that they did not find the weapon that had fired the shots.

Various witnesses described the scene in front of Price's Bar as having been a gun battle involving a lot of gunshots. Detective Matt Davis of the Midland Police Department, who had been a patrol officer on duty at the time, described the area as a very rough area, an "open air -- drug trafficking area." After being dispatched to the area that evening, Officer Davis, as he arrived, saw a cloud of dust being left by a vehicle leaving the parking lot area of Price's Bar. He found a nine-millimeter semiautomatic Beretta pistol close to Keyna's body that was loaded. Officer Davis testified that Keyna's wounds had been made by a small caliber weapon, noting that there were no exit wounds.

Detective Sheldon Johnson of the Midland Police Department was the lead investigator. Detective Johnson described the scene that night as being "pretty chaotic." He confirmed that the area is known for drug sales. The officers interviewed forty or fifty people, recording ten or fifteen of the interviews, but they received little or no cooperation. They were told that there had been a confrontation the day before between Irma Faye Wilson of Midland and Irma Lee Williams of Odessa. Irma Wilson had a child by a man who was also dating Irma Williams. At the time of the

2

confrontation, Irma Wilson was dating Kelvin Lewis who was with her, and he joined in the argument with Irma Williams. Apparently Kelvin said some things during the confrontation that angered the Odessa group. Detective Johnson understood from the interviews that the Odessa group had come to Midland on the evening of July 15 to fight with Kelvin.

That evening, the officers found nine-millimeter and .40-caliber shell casings. They also found a Jennings nine-millimeter pistol on the south side of a place called "Dorothy's." The next morning, the officers found eleven .22-caliber shell casings in a semi-circle just east of the entry door to Price's Bar where Kenya had been shot. Detective Johnson marked where the shell casings were found on State's Exhibit No. 27 (an aerial photograph of Price's Bar facing Illinois Street). Two witnesses testified that they saw appellant standing in the area where the .22-caliber casings were found. Karen Ann Wilson testified that she saw appellant fire a rifle toward Kenya from that spot. Karen said that she did not know if Kenya shot at appellant first, but she saw appellant fire to the right and "Kenya appeared to be ducking." On State's Exhibit No. 61, an aerial photograph, Karen marked where appellant was standing by Kelvin's car and where Keyna was killed in front of Price's Bar; a shot by appellant to his right would have been toward Kenya.

Valerie Shaneal Menefield also considered herself as part of the Midland group. She saw Kelvin and appellant standing by Kelvin's blue Roadmaster. Valerie testified that she did not see anyone between appellant and Kelvin and the victim, Kenya. Valerie marked on State's Exhibit No. 63 where she was standing, where Kelvin and appellant were, and where Kenya was standing. Menefield testified that Kenya was by himself in front of Price's Bar when the shooting started and that she did not see a gun in Kenya's hand. Valerie also stated that she did not see anyone with a gun behind Kenya shooting toward Kelvin and appellant.

Karen testified that, earlier during the evening of July 15, she had seen appellant and Kelvin at her grandmother's house. Appellant had a rifle and was altering it; the stock of the rifle was shorter than normal. In answer to her question, appellant would only say that "he was fixing it." Detective Johnson admitted that the police never found the murder weapon. Both he and Detective Richard Candelaria described the wounds as having been made by a small caliber weapon such as a .22.

3

Detective Johnson said that he received a Crime Stoppers' tip on August 9, 2004. Based on that tip, he then spoke with Karen who lived in Odessa at the time but had grown up in Midland. Karen knew the individuals in both groups and explained the background for the confrontation. Karen was related to Mark Wilson and Antwon Wilson who were part of the Midland group. She told Detective Johnson that the entire matter began with a heated argument between Irma Wilson of Midland (Karen's sister) and Irma Williams of Odessa the day before the conflict.

Based on the Crime Stoppers' tip, Detective Johnson also briefly interviewed Kelvin and appellant. He interviewed Kelvin at 2:10 p.m. and appellant at 2:15 p.m. on August 9, 2004. In his brief conversations with both men, he told them that he wanted to talk about the incident where Kenya was murdered. After being given the Miranda[1] warnings by Detective Johnson, Kelvin invoked his right to counsel. Detective Johnson terminated the interview. He then interviewed appellant who also was incarcerated at the Midland County jail on a charge unrelated to this case. That interview began at 2:15 p.m. and ended within five minutes. After giving appellant the Miranda warnings, Detective Johnson asked him if he was at Price's Bar the night of the shooting. Appellant denied that he was at Price's Bar that evening and stated that he was with his girlfriend, Tammy Holloway. Detective Johnson did not ask appellant any other questions. At the time, Detective Johnson considered appellant a "person of interest, not necessarily a suspect." Detective Johnson told the court that his main suspect at that time was Kelvin.

Tammy Vanessa Holloway testified that she worked at Wal-Mart that day from 2 p.m. to 11 p.m. She admitted that she was appellant's girlfriend on July 15 but said that she was not with appellant that night. Tammy testified that appellant called her from Houston the morning of July 16 and told her to go and tell the police that appellant was with her that evening.

Ashley Robles was another key witness for the prosecution. When she first knew appellant, he was dating her sister. She and appellant were at a motel room in April 2006. Earlier in the day, she had been physically hit by someone named "Lowrow." Ashley testified that appellant became furious and told Ashley that he wanted to go kill Lowrow. When Ashley looked at him, appellant

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

told her he was "not scared to do it, I've done that before." Appellant then told Ashley that he had killed someone before in front of Price's Bar.

The State then rested. Appellant called Detective Johnson as its only witness. Detective Johnson acknowledged that Karen had never stated to him that Kenya did not have a firearm at the time. He also stated that Valerie Menefield told him that she did not see anyone with any weapons on the night in question. Through cross-examination, the prosecution established that Valerie had not wanted to talk to the police.

There were only two objections to the charge. The State objected to inclusion in the charge of a section on third-party defense and a section on extraneous offenses. Both objections were overruled. In final argument, appellant's counsel argued that the Odessa group was the aggressor and that appellant had been acting defensively. The State countered that argument by demonstrating through the exhibits that everyone in the Odessa group except Kenya had retreated because Mark Wilson had a gun. The State argued that, when faced with the fact that Mark had a gun, Jermaine Williams of Odessa said, "We don't want any of that," and they began retreating. Kenya was alone in front of Price's Bar, and he was shot twice from behind. Thus, the State argued that a reasonable inference was that Kenya was starting to retreat.

*Legal and Factual Sufficiency of the Evidence*

In appellant's first four issues, he argues that the evidence was legally and factually insufficient to support his conviction because the State did not prove beyond a reasonable doubt that he had the requisite intent to cause the death of Kenya. *See* TEX. PENAL CODE ANN. § 19.02 (b)(1) (Vernon 2003). We disagree.

To determine if the evidence is legally sufficient, an appellate court reviews all the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979); *Jackson v. State*, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000). To determine if the evidence is factually sufficient, the appellate court reviews all of the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006) (overruling in part *Zuniga v. State*, 144 S.W.3d 477 (Tex. Crim. App. 2004)); *Johnson v. State*, 23 S.W.3d 1, 10-11 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407-08 (Tex. Crim. App. 1997); *Clewis v. State*, 922 S.W.2d

5

126, 129 (Tex. Crim. App. 1996). Then, the reviewing court determines whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414-15; *Johnson*, 23 S.W.3d at 10-11. The jury, as the finder of fact, is the sole judge of the weight and credibility of the witnesses' testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979).

Valerie Menefield placed appellant in the same spot where Karen Wilson placed him – standing by the passenger side of Kelvin's car. She testified that Kenya was by himself in front of Price's Bar and that she did not see a gun in Kenya's hand or anyone behind Kenya with a gun shooting toward appellant. Karen testified that appellant fired his rifle directly at Kenya and that Kenya then "appeared to be ducking." It is a reasonable inference from other evidence that Kenya had been shot; he was not simply "ducking." The specific intent to kill may be inferred from the use of a deadly weapon unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result. *Godsey v. State*, 719 S.W.2d 578, 580 (Tex. Crim. App. 1986). A firearm is a deadly weapon. TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (Vernon Supp. 2009). When a deadly weapon is used in a deadly manner, the inference to kill is almost conclusive. *Vuong v. State*, 830 S.W.2d 929, 934 (Tex. Crim. App. 1992); *Godsey*, 719 S.W.2d at 581; *Pitonyak v. State*, 253 S.W.3d 834, 844 (Tex. App.—Austin 2008, pet. ref'd).

Appellant argues that the intent to kill from appellant's use of a deadly weapon should not be inferred here because it was reasonably apparent that death or serious bodily injury could not result. He cites *Scott v. State*, 81 S.W. 952 (Tex. Crim. App. 1904). That case is distinguishable because the defendant fired a shotgun loaded with birdshot at a person who was 125 to 200 yards away. The court held that there was no evidence that serious injury could have been inflicted at that distance. In this case, appellant was firing a small caliber rifle at fairly close range.

Appellant points out that he was not at the scene when the police came to investigate. The jury no doubt remembered that Detective Davis testified that, as he arrived, there was a cloud of dust left by a vehicle leaving the parking lot area of Price's Bar in a hurry. Early in the investigation, Detective Johnson stopped his interview of appellant when appellant told him that he was not at Price's Bar that night. But Tammy testified that appellant called her from Houston to get her to

6

establish an alibi by telling the police that he was with her that night. Appellant's bragging to Ashley that he had killed someone in front of Price's Bar was additional evidence that he had the intent to kill Kenya at the time of the murder. Other evidence indicating appellant's intent to kill was the location of the numerous .22 shell casings where he had been standing when he fired the rifle toward Kenya.

In appellant's argument concerning factual sufficiency of the evidence, he points out that no murder weapon was found, there was no direct evidence that appellant fired the shots that killed Kenya, there was no direct evidence of the caliber of those bullets, and there were many guns fired by many people at that time. Direct evidence of the exact murder weapon, of the fact that Kenya was shot (and not "ducking") when appellant fired his rifle at Kenya, and of the caliber of the bullets would have strengthened the State's case; however, lack of that evidence does not constitute evidence that appellant did not murder Kenya. The record does reflect that there were multiple gunshots at the time; however, it is far from clear if there were many people shooting. Only appellant and Mark were identified as shooting, although the police found nine-millimeter and .40-caliber shell casings in addition to the .22-caliber casings. Karen testified that appellant was ready to shoot, and he was not trying to avoid any confrontation. She was clear in her testimony that she saw appellant shooting a rifle toward Kenya, who was not very far from appellant. We do not find that the evidence supporting appellant's guilt was so weak that the verdict was manifestly unjust, nor do we find that the conflicting evidence (multiple gunshots) was sufficiently persuasive to outweigh the verdict that appellant was the one who fatally shot Kenya.

Karen and Valerie were part of the Midland group, yet they testified against appellant. Karen was related to Mark and Antwon of the Midland group. During cross-examination, Karen stated that at first she did not mention appellant to Detective Johnson because she felt like appellant was protecting her sister. Karen said that her whole family was upset by the possibility that the Odessa group might come and do something to Irma Wilson. She also testified that she was not expecting any sort of benefit on her federal sentence for her testimony in this case; she was testifying because of her conscience and because she "would want closure" if someone had killed one of her two sons. Valerie made it clear that she was there under subpoena to testify; however, her testimony also was harmful to appellant.

We find that the evidence was legally and factually sufficient to demonstrate that appellant had the requisite intent to kill Kenya and that the evidence supported his conviction. We overrule appellant's first four issues.

*Appellant's Admission to Ashley Robles*

In appellant's fifth issue, he contends that the trial court erred in admitting Ashley's testimony that appellant told her he had killed someone "in front of Price's Bar." The State argues that his statement was admissible as an admission by a party opponent and, therefore, was not hearsay. TEX. R. EVID. 801(e)(2)(A). The State also argues that his statement was a statement against interest and admissible as an exception to the hearsay rule. TEX. R. EVID. 803(24). After stating that appellant became furious over the assault to her and telling her that he wanted to go kill Lowrow, Ashley testified as follows:

A. I asked him – I told him that it wouldn't be a good choice to go do that, and he said – I guess he thought that I was meaning that he was scared or – I don't know. And he says, "I'm not scared to do it, I've done that before."

Q. And did he explain to you where he had killed someone before?

A. Yes.

Q. And what did he say?

A. *In front of Price's Bar* (emphasis added).

Q. All right. Did he have a gun at that time when he was making those threats to go kill Lowrow?

A. Yes, ma'am.

Q. And did he actually try to leave the Bradford Inn motel room and go get in his truck?

A. He was in his truck, and then the cops came and arrested him.

The statement by appellant was an admission by a party; therefore, it was not hearsay. *See* Rule 801(e)(2)(A). A party's own statements are not hearsay and are admissible on the logic that a party is estopped from challenging the fundamental reliability or trustworthiness of his own

statements. *Trevino v. State*, 991 S.W.2d 849, 852-53 (Tex. Crim. App. 1999). We also agree that appellant's statement could be considered as a statement against interest. Other evidence in this case provided the corroborating circumstances that bolstered the trustworthiness of his statement. Appellant admitted to the trial court that the statement was a statement that exposed him to criminal liability and was probably a statement against interest.

Appellant argues that the evidence of his statements to Ashley was more prejudicial than probative. *See* TEX. R. EVID. 403. Because appellant's statements directly showed that appellant intended to and did kill Kenya, the statements were extremely probative and relevant. *See* TEX. R. EVID. 404(b). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002). The probative nature of the statements was not outweighed by their prejudicial effect. The trial court's admission of the testimony was not an abuse of discretion because it did not fall clearly outside the zone of reasonable disagreement. *See Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996). We overrule appellant's fifth issue.

*Evidence of an Extraneous Offense*

In appellant's sixth issue, he contends that Ashley's testimony that he wanted to go kill Lowrow and that he had a gun constituted inadmissible evidence of an extraneous offense. He further contends that if the evidence was admissible, then its probative value was outweighed by its unfair prejudice. Appellant's objection requires a careful analysis of Ashley's testimony.

Ashley's first statement was that appellant became furious and said that he wanted to go kill Lowrow. Apparently appellant did not think that Ashley believed he would kill Lowrow because he then made the admission that he had killed someone in front of Price's Bar. Then came the penultimate question asked by the prosecutor: "Did he have a gun at that time when he was making threats to go kill Lowrow?" Ashley answered, "Yes ma'am."

The trial court properly allowed the initial testimony by Ashley that appellant became furious and told her that he wanted to kill Lowrow. Appellant's statement that he wanted to go kill Lowrow was an inchoate thought and not an extraneous offense. *See Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993); *Castillo v. State*, 59 S.W.3d 357, 361-62 (Tex.App.—Dallas 2001, pet. ref'd). That testimony was necessary to give context to appellant's statement that he "was not scared

9

to do it," that he had "done that before," and that he had killed someone in front of Price's Bar. We have held that statement was admissible as an admission by a party opponent and, therefore, was not hearsay.

The subsequent question, "Did he have a gun at that time when he was making threats to go kill Lowrow?" is more problematic. Appellant argues that this was just an attempt to show that appellant was "a criminal in general." The State argues that even this part of the conversation between Ashley and appellant was admissible because the entire conversation and actions of appellant demonstrated that appellant had the intent to seriously injure Kenya earlier. A truncation of the conversation would not have provided the jury with a proper basis on which to evaluate appellant's admission. *See Delgado v. State*, 235 S.W.3d 244, 253 (Tex. Crim. App. 2007).

Rule 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith." However, it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The exceptions listed under Rule 404(b) are neither mutually exclusive nor collectively exhaustive. *Poindexter v. State*, 942 S.W.2d 577, 583-84 (Tex. Crim. App. 1996). Ashley's testimony that appellant had a gun at the time he acknowledged that he had killed someone in front of Price's Bar lent credence to an inference that his shooting at Kenya was no mistake or accident. The evidence was admissible.

Rule 403 requires exclusion of evidence only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value. *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001). A trial court's ruling under Rule 403 is also reviewed under an abuse-of-discretion standard. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). We do not find that the trial court abused its discretion. Appellant's statements and actions to the effect that he would take care of Lowrow made it more probable that appellant did intend to seriously injure or kill Kenya. The fact that he had a gun at the time was prejudicial, but it did not outweigh the probative value of his admission and his action at the time. We note that the State did not mention Ashley's testimony in closing argument and only referred to it in rebuttal to appellant's closing argument.

We find that the trial court did not err in admitting Ashley's testimony. We overrule the sixth issue.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


October 15, 2009

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of:  Wright, C.J.,
McCall, J., and Strange, J.

11