Opinion filed October 15, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed October 15,
2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                  ___________

 

                                                          No. 11-08-00058-CR 

                                            __________

 

                                     DERRICK
WALTON, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                On Appeal from the 142nd District Court

 

                                                        Midland
County, Texas

 

                                                 Trial
Court Cause No. CR32304

 



 

                                             M E M O R A
N D U M  O P I N I O N

 








A
jury convicted Derrick Walton of murder.  The trial court assessed punishment
at forty-five years in the Institutional Division of the Texas Department of
Criminal Justice.  In appellant=s
first four issues, he argues that the evidence was legally and factually
insufficient to support his conviction.  In appellant=s fifth issue, he argues that the trial court
erred in allowing evidence of hearsay statements by appellant to one of the
State=s witnesses.  In
appellant=s sixth
issue, he argues that the trial court committed reversible error by allowing
evidence of an extraneous offense committed by appellant.  We affirm.

Background
Facts

Kenya
Ray Harris was with a group from Odessa when he was shot in front of Price=s Bar in Midland during a
confrontation between the Odessa group and a group from Midland.  The Odessa
group consisted of Kenya, Jamie McCoy, Nevatiny Berry, and Jermane Williams. 
The Midland group consisted of Jason Spraglin, Mark Wilson, Antwon Wilson,
Kelvin Lewis, and appellant.  Kenya=s
death occurred after dark on July 15, 2004.

The
State=s first witness
was Dr. Sheila Spotswood, a medical examiner in Dallas County.  Dr. Spotswood
was a specialist in forensic pathology and did the autopsy of Kenya.  Dr.
Spotswood testified that Kenya had two gunshot entrance wounds, one on his head
and one on his back.  The shot to the head entered the left, back part of the
scalp and went through the skull, causing multiple skull fractures.  Both
bullet wounds were potentially fatal and were made by distant-range gunshots of
more than three feet.  Dr. Spotswood collected the bullet fragments; however,
police officers subsequently testified that they did not find the weapon that
had fired the shots.

Various
witnesses described the scene in front of Price=s
Bar as having been a gun battle involving a lot of gunshots.  Detective Matt
Davis of the Midland Police Department, who had been a patrol officer on duty
at the time, described the area as a very rough area, an Aopen air -- drug
trafficking area.@ 
After being dispatched to the area that evening, Officer Davis, as he arrived,
saw a cloud of dust being left by a vehicle leaving the parking lot area of
Price=s Bar.  He found
a nine- millimeter semiautomatic Beretta pistol close to Keyna=s body that was loaded. 
Officer Davis testified that Keyna=s
wounds had been made by a small caliber weapon, noting that there were no exit
wounds.








Detective
Sheldon Johnson of the Midland Police Department was the lead investigator. 
Detective Johnson described the scene that night as being Apretty chaotic.@  He confirmed that the
area is known for drug sales.  The officers interviewed forty or fifty people,
recording ten or fifteen of the interviews, but they received little or no
cooperation.  They were told that there had been a confrontation the day before
between Irma Faye Wilson of Midland and Irma Lee Williams of Odessa.   Irma
Wilson had a child by a man who was also dating Irma Williams.  At the time of
the confrontation, Irma Wilson was dating Kelvin Lewis who was with her, and he
joined in the argument with Irma Williams.  Apparently Kelvin said some things
during the confrontation that angered the Odessa group.  Detective Johnson
understood from the interviews that the Odessa group had come to Midland on the
evening of July 15 to fight with Kelvin.

That
evening, the officers found nine-millimeter and .40-caliber shell casings. 
They also found a Jennings nine-millimeter pistol on the south side of a place
called ADorothy=s.@  The next morning, the officers found eleven
.22-caliber shell casings in a semi-circle just east of the entry door to Price=s Bar where Kenya had been
shot.  Detective Johnson marked where the shell casings were found on State=s Exhibit No. 27 (an aerial
photograph of Price=s
Bar facing Illinois Street).  Two witnesses testified that they saw appellant
standing in the area where the .22-caliber casings were found.  Karen Ann
Wilson testified that she saw appellant fire a rifle toward Kenya from that
spot. Karen said that she did not know if Kenya shot at appellant first, but
she saw appellant fire to the right and AKenya
appeared to be ducking.@ 
On State=s Exhibit No.
61, an aerial photograph, Karen marked where appellant was standing by Kelvin=s car and where Keyna was
killed in front of Price=s
Bar; a shot by appellant to his right would have been toward Kenya. 

Valerie
Shaneal Menefield also considered herself as part of the Midland group.  She 
saw Kelvin and appellant standing by Kelvin=s
blue Roadmaster.  Valerie testified that she did not see anyone between
appellant and Kelvin and the victim, Kenya.  Valerie marked on State=s Exhibit No. 63 where she
was standing, where Kelvin and appellant were, and where Kenya was standing. 
Menefield testified that Kenya was by himself in front of Price=s Bar when the shooting
started and that she did not see a gun in Kenya=s
hand.  Valerie also stated that she did not see anyone with a gun behind Kenya
shooting toward Kelvin and appellant. 

Karen 
testified that, earlier during the evening of July 15, she had seen appellant
and Kelvin at her grandmother=s
house.  Appellant had a rifle and was altering it; the stock of the rifle was
shorter than normal.  In answer to her question, appellant would only say that Ahe was fixing it.@  Detective Johnson
admitted that the police never found the murder weapon.  Both he and Detective
Richard Candelaria described the wounds as having been made by a small caliber
weapon such as a .22.








Detective
Johnson said that he received a Crime Stoppers=
tip on August 9, 2004.  Based on that tip, he then spoke with Karen who lived
in Odessa at the time but had grown up in Midland.  Karen knew the individuals
in both groups and explained the background for the confrontation.  Karen was
related to Mark Wilson and Antwon Wilson who were part of the Midland group. 
She told Detective Johnson that the entire matter began with a heated argument
between Irma Wilson of Midland (Karen=s
sister) and Irma Williams of Odessa the day before the conflict.

Based
on the Crime Stoppers=
tip, Detective Johnson also briefly interviewed Kelvin and appellant.  He
interviewed Kelvin at 2:10 p.m. and appellant at 2:15 p.m. on August 9, 2004. 
In his brief conversations with both men, he told them that he wanted to talk
about the incident where Kenya was murdered.  After being given the Miranda[1]
warnings by Detective Johnson, Kelvin invoked his right to counsel.  Detective
Johnson terminated the interview.  He then interviewed appellant who also was
incarcerated at the Midland County jail on a charge unrelated to this case. 
That interview began at 2:15 p.m. and ended within five minutes.  After giving
appellant the Miranda warnings, Detective Johnson asked him if he was at Price=s Bar the night of the
shooting.  Appellant denied that he was at Price=s
Bar that evening and stated that he was with his girlfriend, Tammy Holloway. 
Detective Johnson did not ask appellant any other questions.  At the time,
Detective Johnson considered appellant a Aperson
of interest, not necessarily a suspect.@ 
Detective Johnson told the court that his main suspect at that time was Kelvin.

Tammy
Vanessa Holloway testified that she worked at Wal-Mart that day from 2 p.m. to
11 p.m.  She admitted that she was appellant=s
girlfriend on July 15 but said that she was not with appellant that night. 
Tammy testified that appellant called her from Houston the morning of July 16
and told her to go and tell the police that appellant was with her that
evening.








Ashley
Robles was another key witness for the prosecution.  When she first knew
appellant, he was dating her sister.  She and appellant were at a motel room in
April 2006.  Earlier in the day, she had been physically hit by someone named ALowrow.@  Ashley testified that
appellant became furious and told Ashley that he wanted to go kill Lowrow. 
When Ashley looked at him, appellant told her he was Anot scared to do it, I=ve done that before.@  Appellant then told Ashley that he had
killed someone before in front of Price=s
Bar.

The
State then rested.  Appellant called Detective Johnson as its only witness. 
Detective Johnson acknowledged that Karen had never stated to him that Kenya
did not have a firearm at the time.  He also stated that Valerie Menefield told
him that she did not see anyone with any weapons on the night in question. 
Through cross-examination, the prosecution established that Valerie had not
wanted to talk to the police.

There
were only two objections to the charge.  The State objected to inclusion in the
charge of a section on third-party defense and a section on extraneous
offenses.  Both objections were overruled.  In final argument, appellant=s counsel argued that the
Odessa group was the aggressor and that appellant had been acting defensively. 
The State countered that argument by demonstrating through the exhibits that
everyone in the Odessa group except Kenya had retreated because Mark Wilson had
a gun.  The State argued that, when faced with the fact that Mark had a gun,
Jermaine Williams of Odessa said, AWe
don=t want any of
that,@ and they began
retreating.  Kenya was alone in front of Price=s
Bar, and he was shot twice from behind.  Thus, the State argued that a
reasonable inference was that Kenya was starting to retreat.  

Legal
and Factual Sufficiency of the Evidence

In
appellant=s first four
issues, he argues that the evidence was legally and factually insufficient to
support his conviction because the State did not prove beyond a reasonable
doubt that he had the requisite intent to cause the death of Kenya.  See Tex. Penal Code Ann. ' 19.02 (b)(1) (Vernon
2003).  We disagree.








To
determine if the evidence is legally sufficient, an appellate court reviews all
the evidence in the light most favorable to the verdict and determines whether
any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307 (1979); Jackson
v. State, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000).  To determine if the
evidence is factually sufficient, the appellate court reviews all of the
evidence in a neutral light.  Watson v. State, 204 S.W.3d 404, 414 (Tex.
Crim. App. 2006) (overruling in part Zuniga v. State, 144 S.W.3d 477
(Tex. Crim. App. 2004)); Johnson v. State, 23 S.W.3d 1, 10-11 (Tex.
Crim. App. 2000); Cain v. State, 958 S.W.2d 404, 407-08 (Tex. Crim. App.
1997); Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). 
Then, the reviewing court determines whether the evidence supporting the
verdict is so weak that the verdict is clearly wrong and manifestly unjust or
whether the verdict is against the great weight and preponderance of the
conflicting evidence.  Watson, 204 S.W.3d at 414-15; Johnson, 23
S.W.3d at 10-11.  The jury, as the finder of fact, is the sole judge of the
weight and credibility of the witnesses=
testimony.  Tex. Code Crim. Proc. Ann.
art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979).  

Valerie
Menefield placed appellant in the same spot where Karen Wilson placed him B standing by the passenger
side of Kelvin=s car. 
She testified that Kenya was by himself in front of Price=s Bar and that she did not
see a gun in Kenya=s
hand or anyone behind Kenya with a gun shooting toward appellant.   Karen
testified that appellant fired his rifle directly at Kenya and that Kenya then Aappeared to be ducking.@  It is a reasonable
inference from other evidence that Kenya had been shot; he was not simply Aducking.@  The specific intent to
kill may be inferred from the use of a deadly weapon unless in the manner of
its use it is reasonably apparent that death or serious bodily injury could not
result.  Godsey v. State, 719 S.W.2d 578, 580 (Tex. Crim. App. 1986).  A
firearm is a deadly weapon.  Tex. Penal
Code Ann. '
1.07(a)(17)(A) (Vernon Supp. 2009).  When a deadly weapon is used in a deadly
manner, the inference to kill is almost conclusive.  Vuong v. State, 830
S.W.2d 929, 934 (Tex. Crim. App. 1992); Godsey, 719 S.W.2d at 581; Pitonyak
v. State, 253 S.W.3d 834, 844 (Tex. App.CAustin
2008, pet. ref=d).  

Appellant
argues that the intent to kill from appellant=s
use of a deadly weapon should not be inferred here because it was reasonably
apparent that death or serious bodily injury could not result.  He cites Scott
v. State, 81 S.W. 952 (Tex. Crim. App. 1904).  That case is distinguishable
because the defendant fired a shotgun loaded with birdshot at a person who was
125 to 200 yards away.  The court held that there was no evidence that serious
injury could have been inflicted at that distance.  In this case, appellant was
firing a small caliber rifle at fairly close range.  








            Appellant
points out that he was not at the scene when the police came to investigate. 
The jury no doubt remembered that Detective Davis testified that, as he
arrived, there was a cloud of dust left by a vehicle leaving the parking lot
area of Price=s Bar in
a hurry.  Early in the investigation, Detective Johnson stopped his interview
of appellant when appellant told him that he was not at Price=s Bar that night.  But
Tammy testified that appellant called her from Houston to get her to establish
an alibi by telling the police that he was with her that night.  Appellant=s bragging to Ashley that
he had killed someone in front of Price=s
Bar was additional evidence that he had the intent to kill Kenya at the time of
the murder.  Other evidence indicating appellant=s
intent to kill was the location of the numerous .22 shell casings where he had
been standing when he fired the rifle toward Kenya.  

In
appellant=s argument
concerning factual sufficiency of the evidence, he points out that no murder
weapon was found, there was no direct evidence that appellant fired the shots
that killed Kenya, there was no direct evidence of the caliber of those
bullets, and there were many guns fired by many people at that time.  Direct
evidence of the exact murder weapon, of the fact that Kenya was shot (and not Aducking@) when appellant fired his
rifle at Kenya, and of the caliber of the bullets would have strengthened the
State=s case; however,
lack of that evidence does not constitute evidence that  appellant did not
murder Kenya.   The record does reflect that there were multiple gunshots at
the time; however, it is far from clear if there were many people shooting. 
Only appellant and Mark were identified as shooting, although the police found
nine-millimeter and .40- caliber shell casings in addition to the .22-caliber
casings.  Karen testified that appellant was ready to shoot, and he was not
trying to avoid any confrontation.  She was clear in her testimony that she saw
appellant shooting a rifle toward Kenya, who was not very far from appellant. 
We do not find that the evidence supporting appellant=s guilt was so weak that the verdict was
manifestly unjust, nor do we find that the conflicting evidence (multiple
gunshots) was sufficiently persuasive to outweigh the verdict that appellant
was the one who fatally shot Kenya.

Karen
and Valerie were part of the Midland group, yet they testified against
appellant.  Karen was related to Mark and Antwon of the Midland group.  During
cross-examination, Karen stated that at first she did not mention appellant to
Detective Johnson because she felt like appellant was protecting her sister. 
Karen said that her whole family was upset by the possibility that the Odessa
group might come and do something to Irma Wilson.  She also testified that she
was not expecting any sort of benefit on her federal sentence for her testimony
in this case; she was testifying because of her conscience and because she Awould want closure@ if someone had killed one
of her two sons.  Valerie made it clear that she was there under subpoena to
testify; however, her testimony also was harmful to appellant.  








We
find that the evidence was legally and factually sufficient to demonstrate that
appellant had the requisite intent to kill Kenya and that the evidence
supported his conviction.  We overrule appellant=s
first four issues.

Appellant=s Admission to Ashley
Robles

In
appellant=s fifth
issue, he contends that the trial court erred in admitting Ashley=s  testimony that appellant
told her he had killed someone Ain
front of Price=s Bar.@  The State argues that his
statement was admissible as an admission by a party opponent and, therefore,
was not hearsay.  Tex. R. Evid. 801(e)(2)(A). 
The State also argues that his statement was a statement against interest and
admissible as an exception to the hearsay rule.  Tex. R. Evid. 803(24).  After stating that appellant became
furious over the assault to her and telling her that he wanted to go kill
Lowrow, Ashley  testified as follows:

A.  I asked him B I told him that it wouldn=t be a good choice to go do
that, and he said B I
guess he thought that I was meaning that he was scared or B I don=t know.  And he says, AI=m not scared to do it, I=ve done that before.@

 

Q.  And did he explain
to you where he had killed someone before?

 

A.  Yes.

 

Q.  And what did
he say?

 

A.  In front
of Price=s Bar
(emphasis added).

 

Q.  All right.  Did
he have a gun at that time when he was making those threats to go kill Lowrow?

 

A.  Yes, ma=am.

 

Q.  And did he
actually try to leave the Bradford Inn motel room and go get in his truck?

 

A.  He was in his
truck, and then the cops came and arrested him.

 








The
statement by appellant was an admission by a party; therefore, it was not
hearsay.  See Rule 801(e)(2)(A).  A party=s
own statements are not hearsay and are admissible on the logic that a party is
estopped from challenging the fundamental reliability or trustworthiness of his
own statements.  Trevino v. State, 991 S.W.2d 849, 852-53 (Tex. Crim.
App. 1999).  We also agree that appellant=s
statement could be considered as a statement against interest.  Other evidence
in this case provided the corroborating circumstances that bolstered the
trustworthiness of his statement.  Appellant admitted to the trial court that
the statement was a statement that exposed him to criminal liability and was
probably a statement against interest.

Appellant
argues that the evidence of his statements to Ashley was more prejudicial than
probative.  See Tex. R. Evid. 403. 
Because appellant=s
statements directly showed that appellant intended to and did kill Kenya, the
statements were extremely probative and relevant.  See Tex. R. Evid. 404(b).  Rule 403 favors
the admission of relevant evidence and carries a presumption that relevant
evidence will be more probative than prejudicial.  Hayes v. State, 85
S.W.3d 809, 815 (Tex. Crim. App. 2002).  The probative nature of the statements
was not outweighed by their prejudicial effect.  The trial court=s admission of the
testimony was not an abuse of discretion because it did not fall clearly
outside the zone of reasonable disagreement.  See Jones v. State, 944
S.W.2d 642, 651 (Tex. Crim. App. 1996).  We overrule appellant=s fifth issue.

  Evidence
of an Extraneous Offense

In
appellant=s sixth
issue, he contends that Ashley=s
testimony that he wanted to go kill Lowrow and that he had a gun constituted
inadmissible evidence of an extraneous offense.  He  further contends that if
the evidence was admissible, then its probative value was outweighed by its
unfair prejudice.  Appellant=s
objection requires a careful analysis of Ashley=s
testimony.

Ashley=s first statement was that
appellant became furious and said that he wanted to go kill Lowrow.  Apparently
appellant did not think that Ashley believed he would kill Lowrow because he
then made the admission that he had killed someone in front of Price=s Bar.  Then came the
penultimate question asked by the prosecutor: ADid
he have a gun at that time when he was making threats to go kill Lowrow?@  Ashley answered, AYes ma=am.@








The
trial court properly allowed the initial testimony by Ashley that appellant
became furious and told her that he wanted to kill Lowrow.  Appellant=s statement that he wanted
to go kill Lowrow was an inchoate thought and not an extraneous offense.   See
Moreno v. State, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993); Castillo v.
State, 59 S.W.3d 357, 361-62 (Tex.App.CDallas
2001, pet. ref=d). 
That testimony was necessary to give context to appellant=s statement that he Awas not scared to do it,@ that he had Adone that before,@ and that he had killed someone
in front of Price=s
Bar.  We have held that statement was admissible as an admission by a party
opponent and, therefore, was not hearsay. 

The
subsequent question, ADid
he have a gun at that time when he was making threats to go kill Lowrow?@ is more problematic. 
Appellant argues that this was just an attempt to show that appellant was Aa criminal in general.@  The State argues that
even this part of the conversation between Ashley and appellant was admissible
because the entire conversation and actions of appellant demonstrated that
appellant had the intent to seriously injure Kenya earlier.  A truncation of
the conversation would not have provided the jury with a proper basis on which
to evaluate appellant=s
admission.  See Delgado v. State, 235 S.W.3d 244, 253 (Tex. Crim. App.
2007).        Rule 404(b) provides that evidence of other crimes, wrongs, or
acts is not admissible Ato
prove the character of a person in order to show action in conformity
therewith.@  However,
it may Abe admissible
for other purposes, such as proof of motive, opportunity, intent, preparation,
plan, knowledge, identity, or absence of mistake or accident.@  The exceptions listed
under Rule 404(b) are neither mutually exclusive nor collectively exhaustive.  Poindexter
v. State, 942 S.W.2d 577, 583-84 (Tex. Crim. App. 1996).  Ashley=s testimony that appellant
had a gun at the time he acknowledged that he had killed someone in front of
Price=s Bar lent
credence to an inference that his shooting at Kenya was no mistake or
accident.  The evidence was admissible.

Rule
403 requires exclusion of evidence only when there exists a clear disparity
between the degree of prejudice of the offered evidence and its probative
value.  Conner v. State, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001).  A
trial court=s ruling
under Rule 403 is also reviewed under an abuse- of-discretion standard.   Santellan
v. State, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997).  We do not find that
the trial court abused its discretion.  Appellant=s
statements and actions to the effect that he would take care of Lowrow made it
more probable that appellant did intend to seriously injure or kill Kenya.  The
fact that he had a gun at the time was prejudicial, but it did not outweigh the
probative value of his admission and his action at the time.  We note that the
State did not mention Ashley=s
testimony in closing argument and only referred to it in rebuttal to appellant=s closing argument.








We
find that the trial court did not err in admitting Ashley=s testimony.  We overrule
the sixth issue.  

This
Court=s Ruling

The
judgment of the trial court is affirmed.

 

 

TERRY McCALL

JUSTICE

 

October 15, 2009

Do not publish. 
See Tex. R. App. P.
47.2(b).

Panel consists of:  Wright, C.J.,


McCall, J., and Strange, J. 









[1]Miranda v. Arizona, 384 U.S. 436 (1966).